In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3670

EUGENE BAILEY,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 5735— **Thomas M. Durkin**, *Judge.*

ARGUED NOVEMBER 12, 2014 — DECIDED MARCH 6, 2015

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge*. Eugene Bailey was detained for 23 days while police investigated his role in a schoolyard brawl that resulted in the death of another student. The charges against him were ultimately dropped after the investigation revealed that five other persons, but not Bailey, were involved in the fight. Following his release, Bailey sued the City of Chicago and two police officers for malicious prosecution, intentional infliction of emotional distress (IIED), and viola-

tions of his civil rights under 42 U.S.C. § 1983. The district court granted summary judgment for the defendants on each of the claims, and Bailey appealed. We affirm.

## I. Background

On September 24, 2009, a fight broke out among rival groups of students at Fenger High School (Fenger) in Chicago that resulted in the death of Derrion Albert and injuries to another student, Vashion Bullock. Chicago detectives William Sullivan and Michele Moore-Grose (who, along with the City, have been named as co-defendants) were assigned to the case. The question before us is whether their investigation of Eugene Bailey (the plaintiff here) was properly conducted, or if his detention was unreasonable or excessive.

The major break in the investigation happened within hours of the fight when the investigators obtained video footage showing a number of individuals kicking, punching, and stomping Albert—who would die shortly afterward from the resulting injuries. Relevant to this case is footage from that video of an attacker in red and black shorts and a black polo shirt who punched Albert as he tried to stand up. The detectives showed the video to Chicago police officer Dorothy Massey, who was assigned to Fenger and worked there for several years. Massey identified Bailey and another student as assailants in the video. She claimed that she had known Bailey for eighteen months, and recognized his face in the video. They also showed the video to Derrell Bramlett, a Fenger student (and suspect at the time) who witnessed the fight. Bramlett identified Bailey as one of the attackers and told detectives that he knew him from school. Additionally, he told the detectives

that, earlier in the day, Bailey had been involved in a fight with Bullock, who was the student injured in the brawl.

Based on these identifications, the detectives arrested Bailey and brought him in for questioning at approximately 9 p.m. on September 26. He denied involvement and claimed that he was at his brother's house at the time of the brawl. Pressed for the names of people who could corroborate this, Bailey stated that the only person who saw him at the house was the nine-year-old son of his brother's girlfriend, as the brother and girlfriend were both asleep at the time.

The interview was interrupted when six members of Fenger's staff arrived at the police station. The detectives handcuffed Bailey's left hand to the wall before leaving him in the room. After watching the video, two Fenger staffers, assistant principal Ali Muhammad and security officer Tyrone Ento-Nichols, identified Bailey in the video. The other four staffers did not recognize the individual with the red and black shorts in the video.

Shortly after midnight on September 27, the detectives resumed questioning Bailey. They informed him that he had "a pretty weak alibi" and asked him for the name of his brother's girlfriend. They also told him that staff members identified him as the person wearing red shorts and punching the victim. Bailey once again denied that it was him in the video. After ten minutes, they finished questioning him and handcuffed him to the wall once again.

Three other suspects were arrested during the early morning of September 27. Later that morning, the detectives sent the video to the U.S. Secret Service to enhance the footage

and to obtain still photographs of the individuals involved in the fight.

That afternoon, the detectives spoke with Derrick Young, who informed them that, on the day of the fight, he left school and walked with Bailey to 114th Street and Stewart Avenue, but the two separated afterwards and he did not know where Bailey went. Contrary to Bailey's assertion, Young told the detectives that he and Bailey were friends. The police questioned Young a second time later that day, and showed him still-shots of the video footage. Young identified Bailey as the person wearing red and black shorts who punched the victim in the face. Young also stated that he remembered Bailey wearing those shorts at school that day.

That evening the detectives spoke for a second time to Assistant Principal Ali Muhammad, who had previously identified Bailey in the video but now harbored doubts. Muhammad stated that he believed Bailey to be the person who punched the victim, but that he was "not 100 percent sure." R. at 256. Nor was he certain that Bailey was the person in the red and black shorts in the video.

In the early morning of September 28, the detectives met with Kathryn Morrissey, a supervisor in the Felony Review unit of the Cook County State's Attorney's Office (SAO), which, according to an SAO policy, reviews every violent crime before felony charges are approved. Morrissey approved first-degree murder charges against three suspects but did not approve charges against Bailey because she wanted to continue to investigate his role in the attack. Specifically, she wanted the detectives to speak with Bailey again and to obtain clearer

video footage and still photos of the incident. The detectives placed a "detective hold" on Bailey until the following afternoon to comply with this request and to ensure that he was not released in error before charges could be filed against him.

At 5 pm, the detectives sought once again to speak to Bailey but he requested an attorney and the interview was terminated. The SAO approved first-degree murder and felony murder charges against Bailey at 5:40 pm on September 28. That evening, at 7:40 pm, a state judge held a hearing at the station where the judge entered a probable cause finding against Bailey. He had been in custody for almost 47 hours at the time of the probable cause hearing. On September 29, a different state judge denied Bailey bail pending his trial.

Over the next few days, the detectives received several communications that called into question Bailey's involvement in the incident. After hearing from several anonymous callers who disputed that Bailey was the person in the red and black shorts in the video, the detectives received a call from Bailey's brother, Lavar Johnson, informing them that the person in the video was an adolescent named "DJ." Other witnesses, including LaDonna Jones and Tiffany King, also maintained that Bailey was not the person in the video, however they disagreed about the identity of the person in the red and black shorts: Jones claimed that it was "DJ," while King believed that the assailant was named "Tito."

The most significant interviews took place on September 30 and October 1 when the detectives spoke with Jamal Harding and had a follow-up interview with Young. Harding stated that he had witnessed the fight and remembered seeing a

student in red and black shorts punch the victim. Harding claimed that he had recently learned that the person in the shorts was named "DJ." Most significantly, Young stated that he had made up the story about having seen Bailey with red and black shorts. He also stated that the student in the video was not Bailey, who, in fact, had been with him at 114th Street and Stewart Avenue when the fight broke out.

On October 14, the detectives obtained still images from the video from a forensic laboratory. Over the next few days, the detectives interviewed and showed the still-photos to witnesses, several of whom stated that Bailey was not the person in red and black shorts. Although their assessments were not uniform, the witnesses were consistent in maintaining Bailey was not one of the assailants in the video. Some identified the attacker in red and black shorts as "DJ," while others said they could not identify the individual.

On October 19, the SAO dismissed all charges *nolle prosequi* against Bailey. After further investigation, the SAO charged DJ with first degree murder on November 5. Ultimately, DJ and four other persons were convicted of murder based on the testimony of persons who had identified them in the video.

Bailey filed suit against the detectives and the city alleging violation of 42 U.S.C. § 1983 as well as state law claims (intentional infliction of emotional distress and malicious prosecution) arising from his arrest and detention. On October 30, 2013, the district court granted summary judgment for the defendants on each of Bailey's claims.

## II. Analysis

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hawkins v. Mitchell*, 756 F.3d 990–91 (7th Cir. 2013). We review a grant of summary judgment *de novo* with all reasonable inferences of fact viewed in Bailey's favor as he is the party against whom summary judgment was granted. *Id.* at 991. Bailey's state law claims contain an additional layer as we review a district court's decision to exercise supplemental jurisdiction under 28 U.S.C. § 1367 for an abuse of discretion. *Hansen v. Bd. of Trustees of Hamilton SE School Corp.*, 551 F.3d 599, 606 (7th Cir. 2008).

### A. 1983 Claim

*Probable Cause to Arrest*

Probable cause is an absolute defense to any claim under § 1983 for wrongful arrest or false imprisonment. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679–80 (7th Cir. 2007). Here, Bailey alleges that the officers arrested him without probable cause in violation of his Fourth Amendment rights. He does not dispute that Massey and Bramlett identified him in the video or that the officers based their decision to arrest him on this information. Instead, he contends that the video, in terms of both content and image-quality, was not sufficiently clear to provide a proper basis for his identification; consequently, it was unreasonable for the officers—who had seen the video and were aware of its quality—to believe that a witness could make a credible identification based solely on its contents.

While it is true that the testimony of a single, impartial eyewitness is sufficient to support probable cause, *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012), there is no corresponding rule to account for identifications obtained from persons who were not eyewitnesses to an event but viewed video footage afterwards. We need not, however, carve out a special rule when the operative question is a simple one: were the statements of the witnesses sufficiently credible for the officers to have good reason to rely on them? This is merely another way of stating the well-worn standard for probable cause—whether the facts were sufficient in warranting a prudent person to believe that the suspect had committed an offense. *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 878–79 (7th Cir. 2012). This standard does not require that the officer's belief turn out to be correct; it need only be reasonable. *Texas v. Brown*, 460 U.S. 730, 742 (1983).

At varying points during the investigation, six individuals identified Bailey as the assailant wearing red and black shorts in the video. Although the identifications were later shown to be false, these statements were sufficiently credible at the time that it was reasonable for the officers to rely on them. The individuals came from different backgrounds but every one of them knew Bailey in some capacity. Officer Massey, who claimed to recognize Bailey's face, worked at Fenger and had known him for approximately eighteen months. Bramlett (Fenger student), Muhammad (assistant principal), and Ento-Nichols (security officer) each claimed to know Bailey from school. The most significant identification came from Young, who claimed to be with Bailey that afternoon but separated from him before the fight broke out.

The familiarity between the witnesses and Bailey gave credibility to their identifications and countered concerns about the quality of the video. Other facts supported the belief that Bailey was involved. Bramlett told police that Bailey had been involved in a fight with Bullock (who was injured in the brawl) earlier that day. Young not only identified Bailey, but told the defendants that he remembered Bailey wearing the red and black shorts at school that day.

Although there was evidence suggesting that Bailey was not involved, it was weak and inconsistent. After originally identifying Bailey on the video, Ali Muhammad told the detectives that he still believed it was Bailey on the video but that he was "not 100 percent sure." R. at 256. Speaking with the detectives, Bailey offered a vague account of his whereabouts, claiming that he was at his brother's house at the time of the fight, but that his brother and his brother's girlfriend were asleep and did not see him. His sole alibi witness was the nine-year-old son of his brother's girlfriend. Later, he stated that there were some elderly women on his brother's block who had seen him that day. On balance, the evidence supporting Bailey's involvement in the brawl was stronger than evidence for his non-involvement; in other words, probable cause to arrest Bailey existed because the statements from Massey and Bramlett were both credible and consistent with each other. The later identifications merely confirmed the existence of probable cause.

That the identifications were later shown to be wrong is of no moment: probable cause "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Fleming,* 674 F.3d at 879. "[T]his is an *ex ante*

test: the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant to whether probable cause existed at the crucial time." *Qian v. Kautz*, 168 F.3d 949, 953–54 (7th Cir. 1999).

*Length of Detention*

Because Bailey was detained for fewer than forty-eight hours prior to his probable cause hearing, his detention is presumed to be reasonable, *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), and he bears the burden of demonstrating that the detention was excessive or unreasonable. *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010).

Bailey argues that developments in technology "cry out for a reconsideration of the 48 hour period," App. Br. at 18, but we see no reason to do so here. Bailey, after all, was merely one among several suspects in a murder investigation that contained many moving parts. The balance of the detectives' efforts were spent interviewing suspects and witnesses—activities that technology has yet to render appreciably more efficient. The principal cause of the delay in conducting a probable cause hearing was the City's policy that required all violent felonies to be reviewed by the SAO before charges are approved. Here, there is no evidence that the delay was imposed by defendants for improper motivations such as punishing Bailey or drumming up evidence merely to justify his arrest. *Riverside*, 500 U.S. at 56. Accordingly, we hold that the detention was not excessive or unreasonable.

**B. State Law Claims**

Bailey argues that the district court, upon dismissing his federal claim, should have declined to exercise supplemental jurisdiction over the state law claims. We review a district court's decision to exercise supplemental jurisdiction under 28 U.S.C. § 1367 for abuse of discretion. *Hansen*, 551 F.3d at 606.

Section 1367 lays out a framework by which courts may exercise supplemental jurisdiction over state law claims that share "a common nucleus of operative facts" with a federal claim properly brought before the court. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir. 1999). Here, Bailey's state law claims for malicious prosecution and IIED were based on the same set of facts as his federal claim. Both focused on the circumstances surrounding his arrest, detention, and the investigation by police of the crime for which he was a suspect. In retaining jurisdiction, the judge relied on the fact that extensive discovery was conducted in this case, all of it focusing on the police investigation.

Bailey contends that the judge should have relinquished jurisdiction because the state law claims involved novel questions under Illinois law. He argues, for example, that the Illinois courts have not had the opportunity to address whether actions by police towards persons in custody can form the basis of a claim for IIED. This may well be the case, but § 1367(c)(1) states that a district court *may decline* to exercise supplemental jurisdiction where a state law claim raises a novel or complex issue of state law; it does not require a district court to do so. (Emphasis added.) Once jurisdiction is established based on a properly brought federal claim, § 1367

contains no requirement that such jurisdiction be relinquished. The exercise of supplemental jurisdiction is purely discretionary. "Although a district court may relinquish supplemental jurisdiction following the dismissal of all federal claims, it is not required to do so, unless the federal claims are frivolous and so do not engage the jurisdiction of the federal courts." *CropLife Am., Inc. v. City of Madison*, 432 F.3d 732, 734 (7th Cir. 2005). Here, the district court did not abuse its discretion in exercising supplemental jurisdiction over Bailey's state law claims.

*Intentional Infliction of Emotional Distress*

To recover on a claim for IIED, Illinois law requires a plaintiff to prove: (1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress. *E.g., Schiller v. Mitchell*, 828 N.E.2d 323, 333 (Ill. App. 2005).

Here, the record is devoid of any evidence supporting a finding of extreme or outrageous conduct by defendants, still less any facts suggesting that defendants intended to inflict emotional distress on Bailey. Significantly, the conditions of Bailey's confinement were not covered extensively by the parties and the evidentiary record is largely silent on this issue. Bailey asserts that, with the exception of those periods in which he was questioned by the officers, he was left alone in the interview room and handcuffed to the wall. But this fact was never developed by testimony or other evidence.

The balance of what we know about the conditions of Bailey's confinement we learned at oral argument. There, the City maintained that it was standard procedure to handcuff a suspect to the wall of an interview room whenever personnel were not present. This was done for safety reasons and to prevent witnesses from contacting each other. Additionally, the City maintained that the restraint did not prevent Bailey from sleeping or otherwise moving about the room. Finally, the City noted that police personnel responded to Bailey whenever he requested them, including to use the rest room. Even while reading all inferences in Bailey's favor, the factual record is not sufficiently developed for us to find a question of material fact that the defendants intended to inflict extreme emotional distress on Bailey. For this reason, we lack a basis to overturn the district court's ruling.

*Malicious Prosecution*

Illinois law recognizes that the existence of probable cause serves as a complete defense to a malicious prosecution claim. *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (Ill. App. 2003) (listing the lack of probable cause as a required element for a malicious prosecution claim under Illinois law). As discussed above, probable cause existed during all periods relevant to Bailey's claims and the district court did not err in granting summary judgment on his malicious prosecution claim.

### III. Conclusion

The district court's order granting summary judgment in favor of the defendants is AFFIRMED.