United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 6, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 03-30688

---

LOCAL 107 OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION,

       Plaintiff - Counter Defendant - Appellant,

                versus

OFFSHORE LOGISTICS, INC.,

       Defendant - Counter Claimant - Appellee.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before GARWOOD, HIGGINBOTHAM and SMITH, Circuit Judges.

PER CURIAM:

     This dispute centers on the efforts of Offshore Logistics, Inc., and Local 107 Office & Professional Employees International Union to amend the terms of their collective bargaining agreement. The district court rejected Local 107's attempt to enforce an alleged agreement to raise wages, concluding that the parties did not validly amend the CBA. Finding no error, we affirm.

Offshore and Local 107 are parties to a collective bargaining agreement that governs relations between the parties. Offshore is an air carrier regulated by the Railway Labor Act,[1] and Local 107 is the labor union certified by the National Mediation Board as the bargaining representative for pilots employed by Offshore.

In June 2001, Offshore proposed several modifications to the CBA, including a proposal for two pilot wage increases. Local 107 rejected the offer, but Offshore notified the union of its plans to implement the proposed pay increases unilaterally. Local 107 informed Offshore that it would not challenge the company's action in court if Offshore agreed to prepare a letter of agreement amending the CBA to reflect the new pay schedules. Offshore agreed, but the letter it prepared incorporated only the first pay increase. When Local 107 protested, Offshore responded that it never agreed to the second pay increase.

Local 107 filed suit in district court seeking a declaratory judgment that the parties had entered into a binding agreement for two wage increases. The district court rejected the Union's argument, focusing on two provisions in the CBA. First, Article 38 specifies that amendments to the CBA must be made in accordance with § 6 of the RLA. Second, Article 30 allows the parties to deviate from the CBA only in a writing signed by both parties.

---

[1] 45 U.S.C. §§ 151–88.

Since the parties had followed neither provision, the court concluded that the parties did not effectively amend the CBA and that the second wage increase, even if agreed to,[2] was unenforceable.

## II

The district court resolved the issues in this case on the merits after a trial on the briefs. We review the court's findings of fact for clear error.[3] Legal issues are reviewed de novo.[4]

Because Offshore is an air carrier governed by the RLA and Local 107 is a union certified by the National Mediation Board to represent Offshore's pilots, the parties' CBA was negotiated under the auspices of the RLA. Accordingly, our interpretation of the CBA and the validity of the parties' attempted amendment to it is governed by federal common law.[5] As such, "resolution of this contract-formation dispute is guided by the general common law of

---

[2] The district court did not expressly decide whether the parties actually agreed to two wage increases. Local 107 assumes throughout its briefs that the parties did reach an agreement on both pay increases, while Offshore vigorously disputes that conclusion. We express no opinion on the issue.

[3] *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

[4] *Id.*

[5] *Eastern Air Lines, Inc. v. Air Line Pilots Assoc., Int'l*, 861 F.2d 1546, 1550 (11th Cir. 1988) (citing *Warrior Constructors, Inc. v. Int'l Union of Operating Engineers, Local Union No. 926*, 383 F.2d 700, 708 (5th Cir. 1967)).

3

contracts."[6] However, given the "important federal policy favoring the existence of collective-bargaining agreements, . . . contract law may be given a liberal interpretation."[7]

### III

Local 107 raises three arguments. First, Local 107 argues that the 2002 pay increase should be enforced under the doctrine of promissory estoppel. Second, the Union urges that the underlying purpose of the RLA supports finding a valid contract in this case and that we should ignore ordinary rules of contract that would require a signed writing. Third, Local 107 contends that Article 30 of the CBA, which only bars "deviations" from the CBA, does not apply to "amendments" to the CBA like the one at issue in this case.

### A

Local 107 concedes that the parties did not follow the procedures outlined in § 6 of the RLA and that no signed writing was ever produced. Nonetheless, Local 107 urges that promissory estoppel should prevent Offshore from reneging on its agreement to implement two pay increases. Local 107 argues that it gave up a valuable right -- its right to sue under the RLA to enjoin the company's unilateral pay increases -- in reliance on Offshore's promise to implement two wage increases.

---

[6] *Id.*

[7] *Id.* (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 (1964)).

4

Local 107, however, has failed to demonstrate that all of the necessary elements of a promissory estoppel claim are satisfied here. To establish an enforceable contract based on promissory estoppel, a plaintiff must show (1) that the defendant made a promise, (2) that the defendant reasonably should have expected to induce the promisee's reliance, (3) that the promise actually induced such reliance, (4) that the reliance was reasonable, and (5) that injustice can be avoided only by enforcement of the promise.[8] Local 107 asserts that it "relied" on Offshore's promise to put the pay increases into a letter agreement but does not explain why its reliance was reasonable or why injustice can be avoided only by enforcement of the promise. The Union may in fact have relied on Offshore's statements, but reliance alone is not enough to maintain a claim of promissory estoppel.

More importantly, it appears that no "injustice" would occur by rejecting the Union's promissory estoppel claim. Courts typically find "injustice" only when detrimental reliance is involved -- when a plaintiff changes position or suffers some injury in reliance on a defendant's promise. In this case, the Union did not suffer any harm as a result of Offshore's failure to implement the 2002 pay increases. Although the Union contends that

---

[8] *Aguilar v. International Longshoremen's Union Local # 10*, 966 F.2d 443 (9th Cir. 1992) (listing the federal common law elements of a promissory estoppel claim). This definition of promissory estoppel tracks the language used in Section 90 of the Restatement, Second, Contracts.

it "gave up" the right to bring suit under the RLA to enjoin the pay increases, it could have asserted its rights under the RLA and filed suit as soon as Offshore refused to include the 2002 pay increases in the letter of agreement.[9]  Put another way, the Union did not surrender any right, substantially change its position in reliance on Offshore's promise, or suffer any detriment as a result of its reliance on Offshore's promise: it could have filed suit at any time under the RLA.

We decline the Union's invitation to invoke promissory estoppel.

B

Local 107 next argues that the district court's refusal to enforce the parties' agreement undermines the stated purposes of the RLA.  The Union points to Section 2 of the RLA, which requires parties to make reasonable efforts to make and maintain agreements concerning wages and to settle disputes,[10] and asserts that we should abandon the normal, stringent rules governing contract

---

[9] Furthermore, courts have often refused to apply the doctrine of promissory estoppel when the promisee has other means of pursuing his claims against the promisor.  In such cases, courts conclude that promissory estoppel need not be invoked to avoid injustice because the promisee has other avenues of relief. *See, e.g., Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367 (9th Cir. 2003) (noting that the promisee "has adequate remedies through its viable fraud and negligent misrepresentation claims; therefore, a promissory estoppel claim is not necessary to avoid injustice").

[10] 45 U.S.C. § 152.

6

formation and enforce the parties' agreement even though no writing was produced.

The Union's reliance on Section 2 is misplaced. While there is some support for the notion that the normal rules governing contract formation and validity should be relaxed in the context of the RLA,[11] the Union offers no reason why we should enforce the parties' alleged oral agreement but ignore their written CBA. Indeed, Section 2 seems to compel the opposite result: its command that agreements be "made and maintained" encourages us to "maintain" the parties' agreement that only signed writings can amend the CBA. Beyond the Union's conclusory assertion that "it is an underlying purpose and policy of the Railway Labor Act to favor finding the existence of collective bargaining agreements," the Union offers no explanation why the purpose of the RLA would be advanced by honoring an alleged oral agreement at the expense of a written CBA.

C

Local 107's final argument focuses on the text of the CBA, urging that the district court erred in holding that the CBA requires amendments to be in writing. The district court relied on Article 30 of the CBA, which states that "[a]ny deviation from this Agreement shall be made by mutual consent between the [parties].

---

[11] *See, e.g., Eastern Air Lines*, 861 F.2d at 1550 (noting that, in "light of the important federal policy favoring the existence of collective-bargaining agreements," contract law "may be given a liberal interpretation").

7

Such mutual agreement must be in writing and signed by both parties thereto." The Union contends that this provision applies only to "deviations," not "amendments" to the CBA. To this end, no relevant definition of the term "deviate" includes the concept of amending.

The Union's argument fails on its face: the proposed amendment to the payment schedules falls squarely within any applicable definition of "deviation." According to *Webster's Ninth New Collegiate Dictionary*, the term "deviate" means "1: to stray especially from a standard, principle, or topic; 2: to depart from an established course or norm."[12] *Webster's II New Riverside University Dictionary* uses similar language, defining the term as "to turn or move increasingly away from a specified course or prescribed mode of behavior."[13] Under any of these definitions, the proposed amendment to the CBA was a "deviation." When the parties initially began discussing the pay increases, the CBA already included a term providing for increases in December 2001, December 2002, and June 2003. The parties sought to alter that schedule to include pay increases in June 2001 and June 2002. Clearly, the revised schedule represents a "departure from an established course."

IV

---

[12] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 347 (1990).

[13] WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 370 (1984).

The decision of the district court is AFFIRMED.